IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARON PIZARRO,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>QUINSTREET, INC.,<br><br>　　　　Defendant. | Case No. 22-cv-02803-MMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION; DENYING DEFENDANT'S REQUEST FOR DISMISSAL; STAYING ACTION; VACATING CASE MANAGEMENT CONFERENCE** |

Before the Court is defendant QuinStreet, Inc.'s ("QuinStreet") "Motion to Compel Arbitration," filed July 8, 2022. Plaintiff Sharon Pizarro ("Pizarro") has filed opposition, to which QuinStreet has replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

## BACKGROUND

In her Complaint, Pizarro alleges QuinStreet is a "marketing company" that "sells consumer contact information to lenders" in exchange for referral fees. (See Compl. ¶ 4.) Specifically, Pizarro alleges, QuinStreet "harvests consumer lead information and telephone numbers" through the following form on its website, www.amone.com:

//
//
//
//

---

[1] By order filed August 8, 2022, the Court took the matter under submission.

**Last step to get your quotes**



Phone
PHONE (    )

EMAIL



We encrypt your information using 256 SSL technology.

**See My Rates**

By clicking See My Rates, you agree to the following:

To AmOne's Privacy Notice, Terms of Use, and Consent to Receive Electronic Communications

To share my information with up to five potential callers, lenders, or debt relief partners, for AmOne, and for them and/or AmOne to contact you (including by automated dialing systems, prerecorded messages and text) for marketing purposes by telephone, mobile device (including SMS and MMS), and/or email, even if you are on a corporate, state or national Do Not Call list. Consent is not required in order to purchase goods and services and you may choose instead to contact a customer care representative at 1-800-781-5187.

You authorize AmOne to obtain your credit report and Social Security Number from a credit bureau to verify your identity and match you with up to five lenders or debt relief providers. You further authorize AmOne to provide to these lenders your full Social Security. You further authorize these lenders separately to obtain your consumer credit report, credit score, and other information from one or more consumer reporting agencies to verify your identity and provide you with quotes.

(See Compl. ¶¶ 3, 27.)[2]

---

[2] The subject webpage is no longer available on the above-referenced website. The instant image is taken from a screenshot provided by Pizarro in her Complaint and

1    Pizarro further alleges that, on or around November 13, 2021, QuinStreet "caused a prerecorded voice message to be transmitted to [her] cellular telephone," and that the voice, identifying itself as "AmOne," stated "the caller would like to 'help' with [Pizarro's] 'financial situation'" and "asked [Pizarro] to call . . . back" at a particular telephone number. (See Compl. ¶¶ 20-21, 25.) According to Pizarro, the "unsolicited prerecorded message . . . inva[ded] [her] privacy" and caused "aggravation," "annoyance," "inconvenience[,]" and "disruption to [her] daily life." (See Compl. ¶ 38.)

Based on the above allegations, Pizarro asserts, on behalf of herself and a putative class, a claim for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227(b) and 64.1200(a).

## DISCUSSION

By the instant motion, QuinStreet seeks an order (1) compelling arbitration of Pizarro's claim and (2) dismissing the above-titled action in light thereof.

**A. Arbitration**

Pursuant to the Federal Arbitration Act ("FAA"), contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." See 9 U.S.C. § 2. "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis in original). Thus, a district court's role under the FAA is "limited to determining (1) whether the agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." See Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). "If the response is affirmative on both counts," the court must "enforce the arbitration agreement in accordance with its terms." Id.

---

does not necessarily reflect the size or quality of the form as viewed online.

3

Here, the subject arbitration clause is contained in QuinStreet's "Terms of Use" and provides, in relevant part, that "all disputes between you and [QuinStreet] . . . with regard to your relationship with the Site, including disputes related to this Agreement, your use of the Site, and/or rights of privacy and/or publicity, will be resolved by binding, individual arbitration under the American Arbitration Association's rules for arbitration of consumer-related disputes . . . ." (See Decl. of Alex Yunerman in Supp. of QuinStreet, Inc.'s Mot. to Compel Arbitration ("Yunerman Decl."), Ex. B ¶ 17.)  The American Arbitration Association's rules, in turn, provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or the arbitrability of any claim or counterclaim."  (See Decl. of Becca J. Wahlquist in Supp. of QuinStreet, Inc.'s Mot. to Compel Arbitration ("Wahlquist Decl."), Ex. H at 17.)

QuinStreet argues that, under the terms of the above-quoted arbitration clause, Pizarro must be compelled to arbitrate her TCPA claim and "any issues of scope and enforceability are for the arbitrator to decide."  (See Mot. at 11:13-19.)  In response, Pizarro does not dispute that the arbitration clause, on its face, encompasses her TCPA claim or that it contains a provision delegating questions of arbitrability to the arbitrator.  (See Opp. at 5:3-7.)  Rather, Pizarro argues arbitration should not be compelled because, according to Pizarro, "no arbitration agreement was formed."  (See Opp. at 1:21-23.)

"It is well-established that some 'gateway' issues pertaining to an arbitration agreement, such as issues of validity and arbitrability, can be delegated to an arbitrator by agreement." Ahlstrom v. DHI Mortg. Co., 21 F.4th 631, 634 (9th Cir. 2021).  Where, as here, a party challenges "the very existence of" that agreement, however, such challenge must be resolved by the court.  See Kum Tat Ltd. v. Linden Ox Pasture, LLC, 845 F.3d 979, 983 (9th Cir. 2017); see also Caremark, LLC v. Chickasaw Nation, --- F.4th ---, 2022 WL 3206683, *7 (9th Cir. Aug. 9, 2022) (holding, "even in the presence of a delegation clause," court "must resolve any challenge that an agreement to arbitrate was

4

never formed"). The Ninth Circuit has held this rule to apply "not only [to] challenges to the arbitration clause itself, but also [to] challenges to the making of the contract containing the arbitration clause." See Sanford v. MemberWorks, Inc., 483 F.3d 956, 962 (9th Cir. 2007).

In determining whether an arbitration agreement was formed, "federal courts apply ordinary state-law principles that govern the formation of contracts." Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014) (internal quotation and citation omitted).[3] "To form a contract under . . . California law, the parties must manifest their mutual assent to the terms of the agreement," either "by written or spoken word" or "through conduct." Berman, 30 F.4th at 855.

Here, QuinStreet argues, Pizarro manifested her assent by clicking the "See My Rates" button on the above-referenced web form. (See Mot. at 1:21-2:1; see also Yunerman Decl. ¶¶ 10-14; Compl. ¶ 27 ("By clicking See My Rates, you agree to . . . AmOne's . . . Terms of Use . . . .").) Pizarro argues that, nevertheless, no arbitration agreement was formed because QuinStreet assertedly "failed to provide [her] with conspicuous notice of its Terms of Use." (See Opp. at 1:21-23.) Pizarro further argues that, even if QuinStreet's Terms of Use were sufficiently conspicuous, her manifestation of assent to those terms was not effective because it was "procured . . . through misrepresentations" by QuinStreet. (See Opp. at 2:6-9, 15:1-6.) The Court considers each of Pizarro's argument in turn.

**1. Reasonably Conspicuous Notice**

"[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." Windsor Mills, Inc. v. Collins & Aikman Corp., 25 Cal. App. 3d 987, 993 (1972). "[W]here, as here, there is no evidence that [a] website

---

[3] The "principles of contract formation apply with equal force to contracts formed online." See Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 855-56 (9th Cir. 2022).

5

user had actual knowledge of [an online] agreement," such as the website operator's "terms of use," the occurrence of meaningful assent ordinarily "turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." See Nguyen, 763 F.3d at 1177.  "Whether a [reasonably prudent] user has inquiry notice of [the] . . . agreement, in turn, depends on the design and content of the website and the agreement's webpage," i.e., "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design."  See id.

In her opposition, Pizarro, relying on Berman, contends QuinStreet's Terms of Use were "the antithesis of conspicuous."  (See Opp. at 9:9-10.)  As QuinStreet points out, however, Berman is distinguishable on its facts.  In particular, the textual notice containing the "Terms & Conditions" hyperlink in Berman was displayed "in a tiny gray font . . . so small that it [was] barely legible to the naked eye," surrounded by "comparatively larger" text that "naturally direct[ed] the user's attention everywhere else," and "sandwiched" between a "large green button with text that stated, in easy-to-read white letters, 'Continue>>,'" and two other large buttons that allowed the user to "select [a] gender."  See 30 F.4th at 854, 856-57, App. B.  In addition, "the textual notice [was] further deemphasized by the overall design of the webpage, in which other visual elements," including a bright blue border and "several fields" requiring the user to input information, "dr[ew] the user's attention away from the barely readable critical text."  See id. at 854, 857, App. B.

Here, by contrast, the Court finds QuinStreet's textual notice and Terms of Use hyperlink, when viewed in the context of the overall design and content of the webpage, are "reasonably conspicuous."  See id. at 856.  In particular, the notice and hyperlink appear directly below the "See My Rates" button, are set off by ample white spacing, and are primarily surrounded by text no larger than the notice itself.  Further, the general design of the webpage, which is comprised of only two data fields, is relatively uncluttered and has a muted, and essentially uniform, color scheme.  See Dohrmann v.

Intuit, Inc., 823 Fed. App'x 482, 854 (9th Cir. 2020) (finding contract was formed where terms-of-use hyperlink was "the only text on the webpage in italics" and "located directly below the sign-in button," and where overall webpage design was "relatively uncluttered"); Peter v. DoorDash, Inc., 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) (finding contract was formed where terms-of-use hyperlink appeared "directly below" the "sign-up button," its text "contrast[ed] clearly with the background" and was "plainly readable," and overall webpage design was "uncluttered").[4]  Moreover, the instant hyperlink, although the same color as the rest of the textual notice, is underlined[5] and adequately contrasted with the white background, such that a user would not "be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks."  See Berman, 30 F.4th at 857 (internal quotation and citation omitted).[6]

### 2. Misrepresentation

Pizarro next argues that, even if the Terms of Use provided reasonably conspicuous notice, no contract was formed because QuinStreet "procured her assent" by "misrepresent[ing] essential terms of the proposed contract."  (See Opp. at 2:6-8, 15:1-4.)  In particular, Pizarro contends, QuinStreet "misrepresented" that Pizarro "would receive a loan rate or quote in exchange for inputting her contact information" when,

---

[4] Contrary to Pizarro's contention that cases "predat[ing] Berman" are "no longer good law" (see Opp. at 10:22-23), Berman, as QuinStreet points out, "does not create a bright-line rule requiring [certain] design elements," but, rather, requires courts to examine the "design and content" of the particular website at issue (see Reply at 3:2-7); see also Berman, 30 F.4th at 858; Maree v. Deutsche Lufthansa AG, Case No. SACV 20-885-MWF (MRWx), 2021 WL 4352912, at *3 (C.D. Cal. June 21, 2021) (noting "whether a website's design put users on inquiry notice of its terms of use is highly context specific").

[5] See Sellers v. JustAnswer LLC, 73 Cal. App. 5th 444, 453 n.2 (2021) (noting "a hyperlink is a word, phrase, or image . . . typically underlined or in blue font").

[6] Although Pizarro contends QuinStreet's webpage "suffers from . . . other deficiencies" because it "does not mention the existence of an arbitration provision" or refer to the "Terms of Use . . . within the orange 'See My Rates' button" (see Opp. at 3:24-4:7), none of the cases cited by Pizarro suggest such features are required.

7

instead, she was referred to third-party lenders who could provide her with "loan options." (See Opp. at 11:22-24, 12:22-27.)  As discussed below, the Court is unpersuaded.[7]

"[A] misrepresentation as to the . . . essential terms of a proposed contract" prevents formation of the contract only if it "induces conduct that appears to be a manifestation of assent *by one who neither knows nor has a reasonable opportunity to know* of the character or essential terms of the proposed contract."  See Rosenthal v. Great W. Fin. Secs. Corp., 14 Cal. 4th 394, 415 (1996) (emphasis in original).

Here, although Pizarro argues she did not know the true terms of the contract, she does not argue, nor has she shown, her "apparent assent to the contract[] . . . is negated by fraud so fundamental that [she was] deceived as to the basic character of the [contract] . . . and had no reasonable opportunity to learn the truth."  See id. at 425-429 (finding, where contract challenged by multiple plaintiffs, misrepresentations as to terms rendered assent ineffective only as to those who were "legally blind" or had "limited ability to understand English"); see also Munoz v. Patel, --- Cal. Rptr. 3d ---, 2022 WL 2981178, at *7-8 (Ct. App. July 28, 2022) (noting cases finding lack of reasonable opportunity to learn true character or essential terms of proposed contract typically involve either "some limitation—such as blindness, illness, or illiteracy—[that] prevents a party from reading or understanding a contract" or "parties [that] reach consensus on material terms of an agreement, but one side surreptitiously swaps or modifies the agreement memorializing the terms without the other side's knowledge").

### 3. Conclusion: Arbitration

In sum, for the reasons stated above, the Court finds the parties entered into an agreement to arbitrate.  Accordingly, to the extent QuinStreet seeks an order compelling arbitration, the motion will be granted.

//

---

[7] As noted, challenges to the existence of a contract containing an arbitration agreement must be decided by the court.  See Ahlstrom, 21 F.4th at 635; Sanford, 483 F.3d at 962.

**B. Dismissal or Stay**

The FAA provides that, when "any issue" in an action is "referable to arbitration" under an arbitration agreement, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." See 9 U.S.C. § 3.

QuinStreet argues dismissal, rather than a stay, of the instant action "is the most efficient path forward." (See Mot. at 13:15-16.) Although a court has discretion to dismiss an action where, as here, "all of the claims raised" are subject to arbitration, see Johnmohammadi v. Bloomingdale's, Inc., 755 F.3d 1072, 1073-74 (9th Cir. 2014), in the instant case, in light of the Ninth Circuit's "preference for staying an action pending arbitration rather than dismissing it," see MediVas, LLC v. Marubeni Corp., 741 F.3d 4, 9 (9th Cir. 2014), the Court finds a stay is appropriate, and, accordingly, QuinStreet's request for dismissal will be denied.

## CONCLUSION

For the reasons stated above, the Court orders as follows:

1. QuinStreet's motion to compel arbitration is hereby GRANTED.

2. QuinStreet's request for dismissal of the above-titled action is hereby DENIED, and the action is STAYED pending completion of arbitration proceedings.

3. The Case Management Conference currently scheduled for October 7, 2022, is hereby VACATED.

**IT IS SO ORDERED.**

Dated: August 15, 2022

MAXINE M. CHESNEY
United States District Judge